CITY OF MADISON, a municipal corporation,
and Donald Ramig, Plaintiffs-Respondents,

v.

The APPEALS COMMITTEE of the MADISON HUMAN
SERVICES COMMISSION, Defendant-Appellant.†

Court of Appeals

*No. 83–723. Submitted on briefs April 16, 1984.—
Decided December 27, 1984.*
(Also reported in 361 N.W.2d 734.)

† Petition to review denied.

For the defendant-appellant the cause was submitted on the brief of *Henry A. Gempeler,* city attorney, and *Eunice Gibson,* assistant city attorney.

Brief of amicus curiae was filed by *Michael P. May* and *Boardman, Suhr, Curry & Field* of Madison on behalf of *Wisconsin State Journal.*

Before Gartzke, P.J., Bablitch, J., and Dykman, J.

GARTZKE, P.J.   The appeals committee of the Madison Human Services Commission appeals an order denying its motion to seal a court record.[1] The record consists of the transcript of a hearing before the committee, documents it relied on and its decision in an appeal by an applicant for general relief. The trial court ordered that a copy be made public after deleting from it information by which the applicant could be identified.

The issues are whether opening an edited copy of the record violates sec. 49.53(1), Stats., chills the exercise of the constitutional rights of the relief applicant, or is contrary to the administration of justice. We conclude that disclosing the edited copy will not violate sec. 49.53(1). We reject the constitutional argument and conclude that disclosing the edited copy is not contrary to the administration of justice. We therefore affirm.

The pertinent facts are undisputed. The applicant requested the Madison Department of Social Services to

---

[1] The applicant has not appealed the trial court's order.

provide transsexual surgery as general relief under sec. 49.02(1), Stats. The department denied the request. The applicant appealed to the appeals committee of the Madison Human Services Commission. Following an evidentiary hearing, the appeals committee held that the Madison Department of Social Services must provide the surgery as general relief.

The City of Madison sought circuit court review of that decision. The trial court allowed the Wisconsin State Journal, a Madison newspaper, to participate as amicus curiae. A transcript of the hearing before the appeals committee, the documents applicant submitted to the committee and its decision were filed with the trial court. The committee and the city stipulated that the record made before the committee be sealed.

The trial court attached the documents the committee had relied on and the committee's decision to a copy of the transcript and denied the motion to seal that part of the record. The court deleted from the unsealed materials the applicant's name and address and the names of medical clinics, advocates, certain witnesses, hearing observers, counseling services, physicians, towns in which applicant had lived, pharmacies, prescription numbers, hospitals, psychotherapists and employers, and certain dates. We are satisfied that the editing was thorough.

*Amicus Curiae*

We first address the committee's contention that allowing the State Journal to participate as amicus curiae was error. The trial court overruled the committee's objection on grounds that all arguments should be heard because the issue was a public question going to the very authority of the court. We conclude that the trial court did not abuse its discretion.

As a newspaper, the State Journal possesses an interest in opening the record for public examination and could have intervened as a matter of right to protect that interest. *State ex rel. Bilder v. Delavan Tp.*, 112 Wis. 2d 539, 549–550, 334 N.W.2d 252, 258 (1983). The differences between intervention as a party and the lesser role of amicus curiae are too slight for us to hold, on this record, that the trial court should not have allowed the State Journal to participate as amicus.

*Section 49.53(1)*

The transcript of the hearing before the committee and the documents it relied on are part of the circuit court record. Court records are open for public inspection. Sec. 59.14(1), Stats.[2] The right of public inspection under sec. 59.14(1) has three exceptions. Public records may be sealed (1) if a statute authorizes the sealing of otherwise public records, (2) if disclosure infringes a constitutional right or (3) if the administration of justice requires it. *State ex rel. Bilder v. Delavan Tp.*, 112 Wis. 2d 539, 554–56, 334 N.W.2d 252, 260–61 (1983).

The committee contends that the first *Bilder* exception applies because a statute authorizes sealing the record. Section 49.53(1), Stats., provides in part: "[N]o person may use or disclose information concerning applicants and recipients of general relief under ss. 49.02 and 49.03

---

[2] Section 59.14(1), Stats., provides in relevant part: "Every . . . clerk of the circuit court . . . shall keep his or her office at the county seat . . . . With proper care, the officers shall open to the examination of any person all books and papers required to be kept in his or her office and permit any person so examining to take notes and copies of such books, records, papers or minutes therefrom except as authorized in sub. (3) and s. 19.59(3)(d)."

. . . for any purpose not connected with the administration of the programs." Disclosure to the trial court for judicial review of the appeals committee's decision is for a purpose connected with the administration of the general relief program. Disclosure to the public is not such a purpose.

Section 49.53(1), Stats., protects information regarding applicants for general relief from disclosure. The statute was adopted to comply with federal regulations restricting access to information concerning applicants and recipients of Aid to Families with Dependent Children (AFDC). *State ex rel. Dombrowski v. Moser,* 113 Wis. 2d 296, 300, 334 N.W.2d 878, 880 (1983). The federal law, as reflected in sec. 49.53(1), provides a shield of confidentiality over information regarding AFDC applicants and recipients. 113 Wis. 2d at 301, 334 N.W.2d at 880. Because the legislature has extended sec. 49.53(1) from AFDC to general relief, the same shield protects general relief applicants.

The trial court, however, judicially noticed that the January 14, 1983 edition of the Wisconsin State Journal contained a lengthy interview with applicant. We quote the text of the published interview in the footnote.[3] The

---

[3] "Transsexuals aren't understood at all," said Theresa, "People think we're crazy, we're sick—that we have a choice to be a man or a woman. But there *is* no choice.

"It feels like I'm in the wrong body. I just keep wanting to jump out of my skin. And every day I'm turning back into a man. If I don't get that surgery *within the next week or two,* it will be too late," she said.

Theresa is the transsexual who, as a welfare recipient, is asking the city of Madison to pay for an operation to make her a woman. When the Welfare Appeals Committee voted last week to grant her controversial request, city officials decided to appeal the case in court.

Theresa is not her real name. It is not the female name her friends know her by, not the male name her parents gave her at birth, not the name that appears on stacks of medical documents, psychiatric reports and welfare records.

trial court found, and we agree, that the article, in large part, capsulized applicant's testimony before the committee. Consequently, the information sought to be

It's the name she chose when she agreed to talk with a reporter from The Wisconsin State Journal, with the hope that once her situation is known, it can be understood. The interview took place in the office of her psychiatrist, with her attorney, Sarah Crandall, and her welfare rights advocate, Barbara Lightner.

Theresa's face is framed by long, curling brown hair and marred a bit by a stubble of a beard, a trace of mustache. Her features are strong and pleasant, but neither male nor female.

Her slender body is losing the roundness it had just a few months ago, a feminine fullness induced by years of hormone therapy.

"I'm stuck," she said with a bitter laugh. "I'm half-and-half, a hermaphrodite."

Theresa grew up in a small town in the Midwest. She said she knew by the age of 5, when she preferred playing dress-up to cowboys and indians, that something was wrong.

When I was growing up, everyone would say, "You're a boy, but I always knew it wasn't right," she said. "I could look in a mirror and know intellectually that I was a male. But the older I got, the more I knew I wasn't a male inside, and the more I knew I had to keep that a secret.

"I made two very distinct attempts to be a male. Two days after I turned 18, I joined the Marine Corps, because 'the Marine Corps builds men' and I needed building and by the best." She laughed at the memory. "But they flunked me on the physical. For some reason, they thought I would not make a good Marine—and boy, were they right."

Her second attempt took place when she was 23, and a biochemistry student at the University of Wisconsin-Madison.

"I got married. It lasted about six months, but we were more like roommates, not lovers. We made a couple of attempts at making love, but I didn't like it," she said. She experimented briefly with homosexuality but liked that no better.

"But once I heard the word 'transsexual,' everything made sense," she said.

In 1978, Theresa gave herself a birthday present: an appointment at the University of Minnesota Gender Identity Clinic. After extensive psychiatric testing, she was accepted for treatment, and embarked upon hormone therapy: massive doses of estrogen.

protected by sealing the record is no longer confidential. The shield of confidentiality protects nothing, with one exception.

"It's chemical castration," she explained. "The estrogen suppresses the male hormone, testosterone. Gradually, I started turning into a woman."

As her female characteristics emerged her friends "flipped out."

"I guess I thought they wouldn't notice," she said. "After all, I was the same person I'd always been—inside." She quit taking estrogen for a while, but the old feelings, the sense of alienation within her own body, came back.

"Before I took estrogen, I thought about suicide every day— every single day. But after I started taking it, I felt good about myself for the first time in my life. So I came to understand that if I was going to go through with it, if I was going to be a woman, I had to cut myself off from my former life."

She went back on estrogen and moved to Chicago, where she enrolled in an apprenticeship program to learn a trade she could do at home.

"I knew there would be a long time when I could not go out and get a job because of the way I looked," she said. But after a year, she was kicked out—because of her transsexualism. "The teachers were appalled, just simply appalled. They didn't want me anywhere near the place."

She returned to Madison, got a job in a restaurant and saved for the operation she knew she eventually would have to undergo. The surgery would eliminate her need for estrogen to maintain her female characteristics.

But meanwhile, she continued taking the hormone—until last June, when she developed massive blood clots in her legs. Blood clots, as the label warns on birth control pills, are a not-infrequent side effect of estrogen. The cure was to stop taking the hormone.

"I couldn't. I knew I'd go back to the way I was before. Knowing that everything I'd worked toward would just go away, I got desperate—and I kept taking estrogen."

Within a few weeks, the blood clots were so bad she could hardly walk and so life threatening that her doctor put her in the hospital for two weeks, she wiped out all her savings.

The restaurant where she worked went out of business. Looking like she does—half-male, half-female—she couldn't find another job, so she went on welfare.

The State Journal's article does not disclose applicant's identity. The trial court's editing of the record protects applicant's anonymity. No argument is made that applicant's identity ought not remain confidential. Applicant's identity continues to be information, for purposes of

"If I hadn't developed the blood clots, I'd be just fine. I'd be working and saving for my operation, and staying on estrogen.

"Going on general assistance was something I never wanted to do. I've still got the small-town ethic that welfare is the gutter.

"It's a source of a lot of stress to me that I'm on welfare. It's not something I'm proud of—I'm a talented and capable woman."

In the six months since she quit taking estrogen, her body has been reverting back to maleness—but it will never go all the way back. "I either need this operation, to make me the woman I want to be, the woman I am or I'm going to need a different one to turn me back into a male," she said.

Theresa said she never threatened to commit suicide if she doesn't get the operation. "It's just that years ago, before I started taking estrogen, I thought about suicide every day. Now that I can't take it, those thoughts come back.

"I'm not crazy. If you take a crazy transsexual and remove their appendix, you've still got a crazy person. That's not me.

"Madison is all worried that if I get this operation, every transsexual in the country will move here, but that's just not realistic. Minneapolis has paid for this kind of surgery in the past, but you don't find transsexuals flocking there," she said, adding with a laugh, "besides, how many transsexuals are there? Nobody knows."

Attorney Crandall agreed to represent Theresa in her struggle to obtain the operation "because she needs it. Because what is happening to her is happening out of ignorance and intolerance."

The Welfare Appeals Committe "had a 6½-hour hearing, and after a lot of thought and deliberation, the committe made the right decision," Ms. Crandall said, predicting the city would spend more money fighting the decision than the operation itself would cost. "I don't understand why we need a whole plethora of lawyers for a simple medical problem."

Said Theresa, "This is my last chance. If my life is going to have any meaning, if there is going to be any congruence between my mind and body, I've got to have this operation."

this appeal, the use or disclosure of which is prohibited by sec. 49.53(1), Stats.[4]

We conclude that sec. 49.53(1), Stats., provides no basis for the committee's contention that the trial court abused its discretion.[5]

### Exercise of Right Not Chilled

The committee argues that the second *Bilder* exception applies: that opening the record will chill applicant's exercise of a constitutional right to a hearing on the denial of general relief. We disagree. The applicant has already exercised the right to a hearing. Opening the edited record chills no right.

### Opening Not Contrary to Administration of Justice

Defendant argues that the third *Bilder* exception to opening the court record should apply: that sealing the record is in the interests of the administration of justice. Again we disagree. Because of applicant's published disclosure and the trial court's thorough editing of the

---

[4] The trial court states that applicant's identity was disclosed to the press. No issue is raised regarding the propriety of continuing to treat applicant's identity as confidential.

[5] We have not overlooked the committee's argument that secs. 905.02 and 49.53(1), Stats., give it the power to prevent disclosure of the materials forwarded to the trial court. Section 905.02 provides that an agency "making a return . . . required by law . . . has a privilege . . . to prevent any other person from disclosing the return . . . , if provided by law . . . ." The committee contends that sec. 49.53(1) raises the privilege. We disagree. Section 49.53(1) no longer protects the information in the edited record from disclosure.

copies to be made public, no need exists to seal the record.[6]

Accordingly, we affirm the order of the trial court.

We stayed the opening of the court record pending this appeal. The stay is continued until the record is remitted to the circuit court.

*By the Court.*—Order affirmed.

---

[6] Because of our disposition, we need not consider the committee's argument that the State Journal has no standing to raise constitutional issues. Nor need we consider the constitutional issues the State Journal raises.